**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------- x

MICHAEL BINDAY,                                    :          Case No.

      Petitioner

      - v. -                                        :

UNITED STATES OF AMERICA

      Respondent.                                   :

--------------------------------------------------------- x

**PETITIONER MICHAEL BINDAY'S MOTION TO VACATE,**
**SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

**Name:**        Michael Binday

**Prisoner No.:** 66389-054

**Place of Confinement:**

> Fort Dix FCI
> Satellite Camp
> 5756 Hartford & Pointvile Road
> Joint Base MDL, NJ 08640

1.    **(a)    Name and location of the Court that entered the judgment of conviction under attack:** The United States District Court for the Southern District of New York, Manhattan, New York.

     **(b)    Case number:** 1:12-cr-00152-CM

2.    **(a)    Date of judgment of conviction:** The Judgment against Mr. Binday was entered on July 31, 2014. Doc. 341.

     **(b)    Date of sentencing:** July 30, 2014.

3.    **Length of sentence:** 144 months

4.    **Nature of offense of conviction:**

Count 1 – Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 1349)

Count 2 – Mail Fraud (18 U.S.C. § 1341)

Count 3 – Wire Fraud (18 U.S.C. § 1343)

5.    **Trial and Sentencing:** Mr. Binday entered a plea of not guilty in the instant case. An eleven-day jury trial was held before the Honorable Colleen McMahon between September 17, 2013, and October 7, 2013. Mr. Binday was tried with co-Defendants Kevin Kergil and Mark Resnick. Mr. Binday did not testify at his trial. On October 7, 2013, the jury returned a guilty verdict as to Mr. Binday on Counts 1, 2, and 3. Mr. Binday was sentenced on July 30, 2014, to 144 months (12 years) in prison on each count of conviction, to run concurrently. Doc. 341. The Court additionally ordered Mr. Binday to pay restitution jointly and severally with Mr. Kergil, Mr. Resnick, and Paul Krupit in the amount of $39,308,305.63. Following Mr. Binday's direct appeal, discussed below, the Court amended the restitution owed to $37,433,914.17. Doc. 385.

6.    **Direct Appeal:** Mr. Binday timely appealed from his judgment of conviction.

    (a)    **Name of court:** The United States Court of Appeals for the Second Circuit.

    (b)    **Case number:** 14-2809-cr

    (c)    **Result:** The Second Circuit's opinion in Mr. Binday's direct appeal was entered on October 26, 2015, and is published. *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). The Second Circuit affirmed Mr. Binday's

conviction and sentence but remanded the case for the Court to enter a revised restitution order. *Id.* at 565.

**(d)**   **Grounds raised:** Mr. Binday raised five grounds in his direct appeal:

(1)   Whether the jury instruction on economic harm misstated the law.

(2)   Whether the evidence was legally insufficient judged against a correct jury instruction.

(3)   Whether the indictment was constructively amended.

(4)   Whether the prosecutor's summation argument prejudiced the defense.

(5)   Whether the "loss amount" for purposes of sentencing and the restitution amount were wildly overstated.

**(e)**   **Petition for rehearing en banc:** On November 10, 2015, Mr. Binday filed a petition for rehearing en banc in the Second Circuit. Doc. 181, Case No. 14-2809. The sole issue raised was whether recent United States Supreme Court case law overruled the Second Circuit's precedent that a victim's "right to control" is "property" protected under the mail and wire fraud statutes. On December 14, 2015, the Second Circuit denied Mr. Binday's petition for rehearing en banc. Doc. 189, Case No. 14-2809.

**(f)**   **Petition for writ of certiorari in the United State Supreme Court:** Mr. Binday filed a petition for writ of certiorari from the Second Circuit's opinion on his direct appeal. The Question Presented in the certiorari petition was as follows:

Whether a defendant may be convicted of federal criminal fraud when the purported victim has suffered no loss of tangible property, but has instead

only been deprived of the intangible "right to control" with whom it does business.

The petition was denied on June 20, 2016. *Binday v. United States*, 136 S. Ct. 2487 (Mem.) (2016).

**7.    Grounds upon which this motion is based:**

At Mr. Binday's trial for mail and wire fraud, where the absence of actual loss to the alleged victims was not a defense, Mr. Binday's trial counsel nevertheless focused his efforts on the non-defense of absence of actual loss. Then at Mr. Binday's sentencing, where actual loss to the alleged victims was the single most significant factual issue, Mr. Binday's sentencing counsel declined to require the Government to present evidence of actual loss. Mr. Binday now brings this motion seeking a new trial and sentencing hearing because his counsels' foregoing actions exemplify ineffective assistance of counsel.

**GROUND ONE:**    Mr. Binday was deprived of his federal constitutional right to the effective assistance of counsel because his trial attorney, Elkan Abramowitz, presented defenses based on clear misunderstandings of the law regarding the Government's "right to control" theory of mail and wire fraud.

**A.    Supporting Facts:**

1.    Universal life insurance and "STOLI" policies

This case arises out of the purchase of universal life insurance policies that were intended from the outset to be sold to investors. A universal life insurance policy is one in which the policy owner (or "insured") pays premiums to an insurance company in return for a sum of money, also known as a death benefit, to be paid to a beneficiary upon the

insured's death. Generally, an individual procures a universal life policy through an insurance agent, who receives a commission determined by the insurance company.

A life insurance policy owner can sell his or her interest in the policy to a third party after issuance. This is commonly known as the life settlement market. What results is an agreement whereby an investor pays a life insurance policy's premiums in exchange for being named the policy's beneficiary. Upon the original policy owner's death, the investor receives the death benefit.

When a life insurance policy is purchased with the intent of selling it in the life settlement market, that policy is known as stranger-owned life insurance ("STOLI"). There are common features of a STOLI policy, particularly that the insured life is a person older than 70 years old and the death benefit being sought is more than $2 million. Notwithstanding the similarities between a life settlement and STOLI, many insurance companies distinguished the two in the mid-2000s by publicly claiming that they would refuse to issue STOLI policies. These companies adopted similar practices of publishing anti-STOLI statements and developing STOLI questionnaires for applications that would presumably help them detect whether a policy was STOLI.

Despite their uniformity in claiming that they wanted to deter STOLI, the insurance companies' reasons varied. Some insurance companies feared their reputations would be harmed for producing policies because they may become subject to publicly filed civil lawsuits regarding whether the STOLI policies were contestable. Other companies were concerned that death benefits paid from life insurance policies would lose their preferential tax treatment because the policies would be viewed as an investment vehicle rather than a

retirement investment. The Second Circuit considered these concerns "social" and "non-economic." *United States v. Binday*, 804 F.3d 558, 572 n. 14 (2d Cir. 2015).

As explained below, witnesses for Prudential Insurance Company and Lincoln Financial testified at Mr. Binday's trial that their companies believed STOLI policies were economically different than conventional life insurance policies because STOLI policies were less likely to lapse and STOLI policy owners were more likely to only pay the minimum premium payments, referred to as "minimum funding." Whether the insurance companies could potentially suffer economic harm as a result of issuing STOLI policies and whether the defendants intended to cause any such harm are key issues in Mr. Binday's case.

2.    The allegations against Mr. Binday

In late 2005, Mr. Binday, the owner of an insurance agency in Scarsdale, New York, developed a plan to recruit individuals over the age of 70 to apply for and purchase life insurance policies with face values of more than $2 million each that would later be sold to investors. Simply put, Mr. Binday sought to originate STOLI policies. Mr. Binday worked with co-defendants Kevin Kergil and Mark Resnick, as well as Government witnesses Paul Krupit and Edward Lynch, in the development and execution of this plan between 2006 and 2009. The applications for the STOLI policies included false financial information as to the individuals' net worth and income as well as false answers to questions on the STOLI companies' questionnaires. It was undisputed at trial that Mr. Binday and his co-defendants submitted accurate health information for each of the individuals during the application process.

Once Mr. Binday received a quote for a life insurance policy's annual premium, Mr. Binday shopped the policy to hedge funds or investors. In some instances, an investor would agree to a "two-year deal" with an insured. The crux of this deal was that the investor would fund the first two years of the policy's annual premiums.[1] In other instances, an insured was paid an up-front fee by the investor, soon after the policy's issuance, to make the investor the beneficiary of a trust to which the policy benefit was to be paid. Some policies were issued without either of the aforementioned deals, in which case Mr. Binday continued to attempt to locate an investor for the policy or let the policy lapse. An insured was never required to pay for the premiums out of his or her own pocket. The life insurance companies paid Mr. Binday and his co-defendants commissions from the sale of these policies, as they would for the sale of any life insurance policy.

The Government presented witnesses James Avery and Michael Burns to explain their insurance companies' aversions to STOLI. Avery, the former President of Individual Life Insurance for Prudential Insurance Company, explained that Prudential was concerned about prospective reputational harm and the long-term financial effects it believed STOLI policies would have on the company's bottom line. Prudential anticipated the lapse rates for STOLI policies would be much lower than a conventional life insurance policy, and, therefore, Prudential would be required to pay the death benefit on every policy issued. Neither the Government nor Prudential offered any data to support this concern. Prudential

---

[1] In a "two-year deal," the insured would attempt to sell to a third party the right to be named beneficiary of a trust to which a policy's death benefit would be paid or arrange for the insured's family to keep the policy after two years in exchange for repayment of the premiums the investor paid on the insured's behalf. There was seldom an agreement at the time the policy originated as to who or what entity would acquire the rights to the policy's death benefit after two years.

required a policy owner statement form at the point of sale that included questions for Prudential to detect whether the application was for a STOLI policy, but Prudential's prices did not vary based on the prospective insured's financial information or whether there was an intent to sell the policy interest. The financial information was merely used to ensure an individual was not over-insured and could afford the premium.

Michael Burns, Senior Vice President of Life Product Management for Lincoln Financial and former Jefferson Pilot executive, testified to some of the same concerns as Avery regarding STOLI, such as lower lapse rates and the loss of social and tax benefits for life insurance. Lincoln also anticipated investors would provide minimum funding for the premiums on STOLI policies and considered a prospective insured's net worth in determining whether to issue the policy based on its belief that a wealthy person had better access to health care. Like Prudential, neither the Government nor Lincoln offered any data to support these concerns. In addition to using a form to detect STOLI, Lincoln's underwriters maintained a list of advisers it knew produced STOLI policies. In April 2007, Lincoln began pricing its products for a zero percent lapse rate and minimum funding for individuals older than 70 years old, but the reason for the change was advertised as a mere pricing refresh. The result of the change was that Lincoln would suffer no economic risk of harm if the policies it sold were STOLI.

### 3.    Mail and wire fraud charges

For the foregoing conduct, Mr. Binday was indicted for both substantive and conspiracy counts of mail and wire fraud. "The federal mail and wire fraud statutes penalize using the mails or a wire communication to execute 'any scheme or artifice to defraud, or

for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting 18 U.S.C. §§ 1341, 1343 (2012)). The essential elements of the crime are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme." *Id.* (internal quotations omitted). The mail and wire fraud statutes are analyzed the same way because they use the same relevant language. *United States v. Schwartz*, 924 F.2d 410, 410 (2d Cir. 1991).

The "gravamen of the [mail and wire fraud] is the *scheme* to defraud." *Greenberg*, 835 F.3d at 305 (internal quotations omitted) (emphasis added). A scheme to defraud "demands a showing that the defendant possessed a fraudulent intent," but "does not require the government to prove that the victims of the fraud were actually injured." *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006). Mail and wire fraud punish "the scheme, not its success." *United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991). "Only a showing of intended harm will satisfy the element of fraudulent intent." *Id.*

The "scheme to defraud" element also requires the Government to prove a material misrepresentation. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000). "[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013) (internal quotations omitted). The statement's materiality must be viewed objectively. *United States v. Frenkel*, No. 15-2660, 2017 WL 946727, at *2 (2d Cir. March 8, 2017).

9

A recognized property interest protected by the mail and wire fraud statutes is the "right to control" how assets are spent. *United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991). "[A]pplication of the [right to control theory] is predicated on a showing that some person or entity has been deprived of potentially valuable economic information." *Id.* at 462–63. In other words, the right to control theory requires that the "misrepresentations or non-disclosures can *or* do result in tangible economic harm." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) (emphasis added). "Depriving a victim of 'potentially valuable' information necessarily creates a risk of tangible economic harm." *Id.* "The economic harm may be manifested directly—such as by increasing the price the victim paid for a good—or indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received." *Id.*; *see also United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) ("The information withheld either must be of some independent value or must bear on the ultimate value of the transaction."). It is insufficient for the scheme to merely induce a victim to enter into a transaction he or she would otherwise avoid. *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).

In summary, permissible defenses to a charge of mail or wire fraud based on the deprivation of a victim's right to control are (1) the defendant's lack of intent to defraud, (2) that any misrepresentations were not material, and (3) that the misrepresentations could not result in tangible economic harm or, stated another way, the victim was not deprived of "potentially valuable economic information." It is not a defense to mail or wire fraud that a person has not actually been harmed or deceived. As explained below, this motion arises from Mr. Binday's counsel, Elkan Abramowitz, pinning his defense at trial on the

proposition that Mr. Binday was not guilty because the insurance companies did not suffer actual harm – a proposition lacking in legal support.

4.      Mr. Abramowitz's representation

Mr. Abramowitz represented Mr. Binday for less than six months before his trial as a result of the disqualification of original counsel. The trial strategy he developed was simple but critically flawed. The Government filed a motion in limine one month before trial to preclude argument that Mr. Binday did not cause actual harm to the insurance companies. Doc. 230. Mr. Abramowitz argued in response that he did not read the Indictment to allege a "right to control" theory of fraud but instead as one that alleged the actual infliction of economic harm to the victims. Doc. 233. Mr. Abramowitz further asserted that whether actual economic harm occurred was relevant to the essential elements of mail and wire fraud.  Doc. 233. The Court granted the Government's motion in limine and held that actual economic loss was irrelevant to Mr. Binday's case.

Undeterred, Mr. Abramowitz continued to focus on the lack of actual economic harm during Mr. Binday's trial as a defense to the crimes charged. This theme permeated his opening statement:

> Abramowitz: As the judge will instruct you, if no one has been defrauded, if no one has been defrauded, if no one has suffered economic harm, then…

> ***

> Abramowitz: No one involved in this investment plan suffered any tangible economic harm. So in reality, there are no victims here.

> ***

11

Abramowitz: It is important to know that there was no economic harm to the person whose life was insured, the senior citizens.

\*\*\*

Abramowitz: So why are we here? Why are we here if the insurance companies aren't suffering any tangible economic harm if the person getting the insurance isn't harmed and actually benefits if the insurance companies actually encourage premium financing and life settlements? [sic]

\*\*\*

Abramowitz: In short, when you get a chance to go through all of the evidence in this case, you will not see that the insurance companies suffered any tangible economic harm, period. If they did not suffer any tangible economic harm, there cannot be a scheme to defraud, and any lies may have occurred on the applications simply do not constitute a crime.

Doc. 262 at 26, 27, 31, 32, 37.

This flawed defense then continued to infect the entirety of the proceedings. For instance, Mr. Abramowitz cross-examined Silas Griffin, one of the senior citizens for whom Mr. Binday helped procure insurance, regarding whether he personally paid any money toward the insurance policy premiums. Doc. 264 at 16–17. He questioned Prudential's witness, Avery, "for informational purposes" regarding whether Prudential would invest the premiums expecting to earn money off of the investment. Doc. 268 at 68. During the motion for judgment of acquittal, Mr. Abramowitz made the following arguments regarding actual economic harm:

Abramowitz: Now with respect to that [tangible economic harm issue], 16 witnesses were called by the government. Only two were in a position to speak to the alleged impact, and that is Messrs. Avery and Burns. They simply proved that there was no tangible economic harm…

***

Abramowitz: That means that as far as a tangible economic impact, that he
acknowledged there was no economic impact.

***

Abramowitz: And there are several economic issues that are listed in the
indictment at Paragraph 4. The government did not prove them.
In fact, they proved the opposite, proved that these are
intangible property rights.

***

Abramowitz: There wasn't a witness that said we suffered any tangible
economic harm here. They said the opposite. They didn't want
the STOLI policies, there is no question about that, but there
was no economic harm offered, no dollars and cents on a
balance sheet and no tangible economic harm.

***

Abramowitz: Therefore, what is left is testimony that really is clear that there
was no economic harm. STOLI is a controversial type of life
insurance. It can be dealt with in different contexts. It cannot
be dealt with in the context of a crime of mail fraud because
there was no economic harm, or at least we didn't hear any.
Thank you.

Doc. 276 at 14–15, 16, 18–19, 20.

After the Defense rested its case-in-chief, Mr. Abramowitz and his partner,

Benjamin Fischer, proposed a jury instruction based on another misunderstanding of mail

and wire fraud, that there was no scheme to defraud unless the insurance companies were

deceived:

Fischer:        We suggest the following language.

13

But if you find that the government has not proved beyond a reasonable doubt that the insurance companies were deceived, they could not have been victims of a scheme to defraud. The insurance companies would not have been deceived if you conclude they were aware of the misrepresentations or turned a blind eye toward them.

\*\*\*

Fischer:      But in that case, your Honor, the theory of the defense was exactly the same as the theory of the defense in this case that if the victim of a fraud, the so-called purported victim of a fraud isn't deceived, then there is no fraud. There can be not a fraud. Putting aside the state of mind, putting aside reliance, we're not even talking about reliance, which was the point of the underwriting exercise that we went through and consistent with–

Court:      That's true if fraud is what is charged, but we've got a scheme to defraud charged here. Scheme to defraud, a scheme doesn't have to succeed. If the scheme doesn't have to succeed, that means the victim doesn't have to be deceived.

Abramowitz:  That's true of any mail fraud, there's a scheme to defraud. That's the charge given.

This is the heart of the defense. When there is no deception, there is no scheme. And there's no contemplated scheme if the victim knows that it's not a lie. It's as simple as that. And that was the charge given in that case and it's been given in other cases as well.

\*\*\*

Abramowitz:  It's an intent crime and the argument is they knew it. And if they knew it, there could not have been a false statement and, by inference, no intent.

McCallum:    Your Honor, that's just not the law.

Court:      That's not the law of intent. That's not the law of intent.

14

Abramowitz: But it's the law of the question whether there's a victim, your Honor. You cannot have a lie if the person is not deceived, a material lie.

\*\*\*

Fischer: Your Honor, I think what we found you is cases where the defense theory has been exactly our theory, where they argued to the jury that these defendants did not commit a fraud and were not engaged in a scheme to defraud because the victim, the so-called victim wasn't deceived. They knew what they were getting, there has not been a fraud, there could not be a fraud, and there could not be a deception. It's a critical component of our case. It's what the underwriting exercise was all about.

Court: I hear you and I'm totally sympathetic, but as I immersed myself in these charges and in Judge Sand, it appears, weird though it may sound, that deception is not required. What's required is an intent to deceive.

Abramowitz: And we can disprove an intent to deceive if there is no deception.

Court: No. You're leaving out a word. You're leaving out a phrase. You can disprove intent to deceive if you can prove—you have nothing to prove. Let me make that real clear so that if you ever find yourselves in the circuit, nobody can suggest that I somehow imposed a burden on the defense. You have nothing to prove.

But if your defense is no intent to deceive, then what your client knew about what the insurance companies were doing suddenly becomes very important because the mere fact that the insurance companies were doing it doesn't say anything about your client's state of mind. An intent is your client's state of mind, not the insurance company's state of mind.

Doc. 278 at 88–89, 93–94, 94–95, 95–97. The Court declined to give the proposed instruction and, instead, elected to educate Mr. Abramowitz as to the two viable defenses he could argue to the jury: lack of materiality and lack of intent. Doc. 278 at 100–101.

15

Notwithstanding the Court's explanation, Mr. Abramowitz argued to the jury in his closing argument that Mr. Binday was not guilty because there was no economic harm and because the insurance companies were not deceived. *See* Doc. 280 at 56 ("Now, you don't have to take my word for the fact that the insurance companies didn't suffer any economic harm from these defendants."); Doc. 280 at 60 ("Now, not only did the insurance companies suffer no harm, they were not deceived in the slightest, in the slightest by the lies on the applications forms and, thus, these lies did not matter to the insurance companies; and, therefore, were not material."). Finally, Mr. Abramowitz submitted a motion for a mistrial after closing arguments in which he said the issue of whether the insurance companies suffered economic harm "went to the most critical and hotly contested issue in this case." Doc. 245.

5.    Ineffective assistance of counsel

The Sixth Amendment right to counsel is "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "An accused is entitled to be assisted by an attorney…who plays the role necessary to ensure that the trial is fair." *Id.* at 685. There is a two-prong standard for ineffective assistance of counsel. *Id.* at 687. "A petitioner must show (1) that his counsel's representation 'fell below an objective standard of reasonableness,'" and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (quoting *Strickland*, 466 U.S. at 687).

To meet the first prong, defense counsel's performance must be "so deficient that it falls outside the 'wide range of professionally competent assistance.'" *Kovacs v. United*

16

*States*, 744 F.3d 44, 50 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 688). "Counsel…has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. For instance, defense counsel's performance is deficient when his or her conduct resulted from a misunderstanding of the law. *Greiner v. Wells*, 417 F.3d 305, 325 (2d Cir. 2005).

Mr. Abramowitz's misunderstanding of the law is not just obvious, but it was deficient under the first prong of *Strickland*. The Court ruled prior to trial that the "critical and hotly contested" issue of whether there was actual economic harm to the insurance companies was irrelevant to the charges against Mr. Binday. Further, whether the victims were deceived, which Mr. Abramowitz called the "heart of the defense," could not directly rebut the "scheme to defraud," or any other, element of mail or wire fraud. Both of these defenses were clearly foreclosed by Second Circuit case law that Mr. Abramowitz could readily access.[2] Even after the Court educated Mr. Abramowitz as to the two defenses he could raise to the jury, lack of intent and lack of materiality, he did not adapt his strategy. Mr. Abramowitz's ignorance of the law is "a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014).

As to the second prong of *Strickland*, a showing that Mr. Abramowitz's misunderstanding of the law prejudiced Mr. Binday requires a showing of "a probability

---

[2] *See Novak*, 443 F.3d at 156 ("While [the mail fraud] language does not require the government to prove that the victims of the fraud were actually injured, the government must at a minimum prove that defendants contemplated some actual harm or injury to their victims."); *Wallach*, 935 F.2d at 461 ("[A]pplication of the [right to control theory] is predicated on a showing that some person or entity has been deprived of *potentially* valuable economic information.") (emphasis added); *Helmsley*, 941 F.2d 71, 94 ("[S]uccess of a scheme to defraud is not required."); *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) ("[T]he deceit must be coupled with a *contemplated* harm to the victim.") (emphasis added).

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "This does not require a showing that counsel's actions more likely than not altered the outcome." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011). There merely must be a "substantial" likelihood. *Id.* "Prejudice inquiries require the exercise of a court's best judgment," but such an inquiry "will necessarily require a court to speculate." *United States v. Roy*, 855 F.3d 1133, 1166 (11th Cir. 2017) (internal quotations omitted).

Mr. Abramowitz's misunderstanding of the law supporting the mail and wire fraud charges prejudiced Mr. Binday's defense at trial. There were viable defenses to the intent and materiality elements of mail and wire fraud. Mr. Abramowitz did not properly present these defenses, electing instead to assert "defenses" that were unsupported by the law. There is a substantial likelihood that the evidence that Mr. Abramowitz neglected to present and the examinations he failed to conduct would have altered the outcome of the case.

A defense based on Mr. Binday's lack of intent to harm the insurance carriers was not merely viable, but the defense was buttressed by the facts of his case.[3] Mr. Abramowitz could have argued that Mr. Binday lacked the intent to harm the insurance companies because he thought the companies knew the policies he produced were STOLI irrespective of false representations as to intent and net worth. There was ample evidence introduced at trial that many applications were flagged as STOLI, but the applications continued to be approved by the insurance companies. GX 9400; DX 3042, DX 3271; Doc. 278 at 22–65. This evidence was presented to disprove that the victims were deceived, but as a matter of

---

[3] Mr. Abramowitz briefly mentioned Mr. Binday's lack of intent to defraud in his opening statement and closing argument, but, as explained herein, he failed to make the defense a pivotal issue during the trial.

law that was a non-issue. It should, however, have been used by counsel to argue Mr. Binday's lack of intent to harm and explain how he perceived the insurance companies' actions as encouraging his business.

Additionally, there were emails between Mr. Binday and one insurance carrier, Prudential, that could have been entered as evidence to refute the Government's theory that Mr. Binday had an intent to defraud. Exhibit A. These emails include Mr. Binday's conspicuous signals to Prudential that the applications being submitted were for STOLI policies.

In January 2006, Prudential notified Mr. Binday that his contract with the carrier would be terminated for not producing enough revenue. Mr. Binday promptly wrote to Prudential's Regional Director Lily Levith to address the notice and explain that he was interested in submitting "large cases," a term used throughout the trial to describe STOLI and one he expressly associated with non-recourse premium financing. Ex A at 1. Mr. Binday emailed Ms. Levith the following day to inform her that he had two "large cases" he intended to submit to Prudential with obvious STOLI features, such as high annual premiums and death benefits for more than $3 million. *Id.* at 2. A few days later, Mr. Binday followed up with Ms. Levith to request that she extend his agency's contract with Prudential, thereby allowing him to submit "substantial cases." *Id.* at 3. Mr. Binday further identified the type of "large cases" he sought to submit by indicating the policies would require the creation of a trust, another obvious feature of STOLI policies. *Id.* at 4.

Ms. Levith responded to Mr. Binday's request on January 31, 2006, by not only extending Mr. Binday's contract through June 2006 but also by giving him a "target

premium" of $250,000 per year. *Id.* at 6. Based on this understanding, Mr. Binday submitted policies with high premiums and death benefits to Prudential. Had these emails been offered as evidence at Mr. Binday's trial, they would have demonstrated yet again that Mr. Binday had no intent to harm the insurance companies because together they had achieved an arrangement that he would continue to produce the business they wanted privately but could not accept publicly due to purely social and non-economic concerns. In summary, Mr. Abramowitz could have asserted to the jury that Mr. Binday asked for and was given permission to submit STOLI policies by an insurance carrier.

Furthermore, Mr. Abramowitz should have presented evidence regarding Mr. Binday's knowledge of the economic similarities between STOLI policies and other acceptable forms of life insurance as evidence that Mr. Binday did not believe there was economic value to the falsified information. For instance, Mr. Binday knew that insurance companies allowed for insurance policy premiums to be funded using hybrid-financing or single premium immediate annuities ("SPIA"). Both methods of funding relied on money provided by third parties to pay premiums, would have led to a low lapse rate, and would have resulted in the minimum funding of premiums. Mr. Binday believed these means of funding life insurance policies were based on the same arbitrage as STOLI policies. Accordingly, he reasonably believed that no economic harm would be caused to the insurance companies under STOLI if they voluntarily allowed such funding under SPIA and hybrid financing.

A SPIA involves back-to-back insurance by two carriers. One issues a life policy, payable at death with premium due until death; the other is a single premium annuity,

paying monthly or quarterly until death. The latter's annuity payments are designed to pay the former's premiums. These transactions resulted in the horrors presented by Government witnesses as to why the insurance companies feared STOLI—no lapse and minimum funding—yet SPIAs were supported by the industry for many years and Mr. Binday knew this. Hybrid-premium finance loans were essentially the type of loans Mr. Binday used for his business. The industry had used non-recourse lending for many years but decided to back away from it due to regulatory concerns—insurance regulators deemed these programs deficient and carriers came to call such programs STOLI. Many carriers, including Lincoln, continued to generate the same business that non-recourse lending generated, STOLI, by the fiction of "hybrid" loans. Unlike non-recourse, where the borrower had no obligation to pay, a hybrid loan requested a personal guarantee of usually 25 percent of the loan amount that expired after 24 months.

Mr. Binday and most other people with knowledge of the life insurance industry, including the former President of John Hancock,[4] realized that hybrid lending was simply another form of STOLI, and Mr. Binday assumed that carriers willing to accept hybrid loans had no economic (or real) aversion to STOLI. The hybrid borrower would look to sell the policy after 24 months to retire its debt or surrender the policy to the lender, and the new investor-owner would make minimum premium payments and likely hold the policy until death without lapse.

---

[4] Steven Finch, the former President of John Hancock Life Insurance, wrote in 2007, "These 'hybrid' arrangements are still designed solely to put returns from life insurance policies into investors hands." GX 2911 at 1 (attached as Exhibit B).

Mr. Binday also offered to testify on his own behalf to directly refute the intent element and to support all the foregoing points. Mr. Abramowitz, however, informed Mr. Binday his testimony was unnecessary because, according to Mr. Abramowitz, the Government had not proven economic harm. As explained above, this decision was based on the same misunderstanding of the law that infected Mr. Binday's trial. The Second Circuit stated this was a case where intent was based purely on inferences. *Binday*, 804 F.3d at 579. Mr. Binday's testimony would have been "unique and inherently significant" for his defense. *Nichols v. Butler*, 953 F.2d 1550, 1553 (11th Cir. 1992). His testimony would have focused on his lack of intent to inflict a genuine harm on the insurance companies because he did not believe the financial information or the questions regarding STOLI were essential parts of the bargain between him and the insurance companies to issue life insurance policies. "A defendant's decision to take the stand and testify to his own state of mind provides the rare opportunity for direct evidence to be presented to the jury." *United States v. Tobin*, 676 F.3d 1264, 1287 (11th Cir. 2012), *abrogated on other grounds by United States v. Castro*, 736 F.3d 1308, 1313 (11th Cir. 2013). This would have also permitted Mr. Binday to present a prior consistent statement: a conversation recorded during the pendency of the alleged scheme by an insured's family member during which Mr. Binday stated his belief that the insurance companies were already pricing for a zero percent lapse rate and, thus, could not suffer economic harm from issuing STOLI policies. *See* Exhibit C at 17 ("[The insurance companies] ruled it out—they got out of lapse pricing years ago.). There is therefore a reasonable likelihood the jurors would have acquitted Mr.

Binday if they heard his side of the story,[5] but it was Mr. Abramowitz's deficient representation that deprived Mr. Binday of that opportunity.

As to a lack-of-materiality defense, Mr. Abramowitz finally formulated and implemented this defense in his closing argument, but this was too late to present any evidence to support it. For example, there were publicly filed court orders that stated Lincoln knowingly issued dozens, possibly hundreds, of STOLI policies. *See Lincoln Nat. Life Ins. Co. v. Gordon R.A. Fishman Irrevocable Life Trust*, 639 F. Supp. 2d 1170, 1172 (C.D. Cal. 2009); *Life Product Clearing, LLC v. Angel*, 530 F. Supp. 2d 646, 648–649 (S.D.N.Y. 2008).

Finally, Mr. Abramowitz could have raised a defense regarding the reasonableness of the insurance companies' expectations that STOLI policies would potentially cause tangible economic harm. Avery and Burns provided unsupported, and at times contradicting, testimony as to the "economic" concerns their companies had regarding STOLI policies. The Second Circuit held the testimony passed muster but stated in a footnote that a victim's belief that information was economically valuable may not suffice if the belief "were entirely unreasonable or idiosyncratic" and a business decision that information is economically valuable must be "informed and plausible." *Binday*, 804 F.3d at 574 n. 17. Mr. Abramowitz should have further cross-examined the witnesses regarding the basis for their companies' concerns or presented other evidence that the insurance

---

[5] As the Court stated during the charge conference, "But if your defense is no intent to deceive, then what your client knew about what the insurance companies were doing suddenly becomes very important…." Doc. 278 at 96–97.

companies' decisions were not adequately informed. For example, a memorandum submitted in a civil case contesting STOLI policies in the Southern District of Florida stated that Sun Life Assurance Company, one of the carriers in the present case, believed STOLI policies would be economically harmful because investors would selectively lapse policies, depriving Sun Life of anticipated revenues. *Sun Life Assurance Co. of Canada v. Imperial Holdings, Inc.*, Case No. 9:13-cv-80385-DLB, Doc. 160, at 1 (attached as Exhibit D). The foregoing concern is directly at odds with Prudential and Lincoln's alleged assumption, presented at trial, that STOLI policies would never lapse, as well as the claim that lapses are desired and STOLI undercuts that desire. Mr. Binday would have also testified based on his experience that the insurance companies' expectation that STOLI policies would never lapse or lapse at a minimal rate, which the Government repeated throughout the trial, was unreasonable. Indeed, it was known at the time of trial that four of the five Lincoln life insurance policies the Government had addressed in its case-in-chief had already lapsed.

Mr. Abramowitz's misunderstanding of the law resulted in a confusing and legally insufficient defense at Mr. Binday's trial. Because there were other viable defenses to the mail and wire fraud charges, Mr. Binday was prejudiced by Mr. Abramowitz's deficient performance. Therefore, Mr. Binday was deprived of his Sixth Amendment right to effective assistance of counsel.

> **B.      Direct appeal of Ground One:** Mr. Binday did not raise Ground One in his direct appeal.

**C.** **Post-conviction proceedings relating to Ground One:** Mr. Binday has not raised Ground One in any prior post-conviction motion.

**GROUND TWO:** Mr. Binday was deprived of his federal constitutional right to the effective assistance of counsel because his sentencing attorney, Andrew Frisch, failed to properly challenge the calculation of actual loss used to determine Mr. Binday's guideline sentence.

**A.** **Supporting Facts:**

1. Mr. Frisch's representation

Mr. Frisch began representing Mr. Binday about four months before his sentencing hearing. Doc. 300. When Mr. Frisch appeared in the case, the Government was arguing for a sentence based on an intended loss amount of $130,252,357. Doc. 323. Mr. Frisch successfully persuaded the Court to impose a sentence based on actual loss, Doc. 327, but a dispute arose as to how to calculate the actual loss from Mr. Binday's conduct.

Mr. Frisch argued there was no loss or it was nominal because there was no difference between the STOLI policies the companies issued and a conventional life insurance policy. Doc. 327. The Government asserted that the actual loss should be calculated by adding the commissions and death benefits paid to date by nine insurance companies and subtracting from that total the premiums paid to the companies on those policies. Applying this formula, the Government sought the following as actual losses:

American General – $10,430,555

AXA – $152,408

Hancock – $3,826,101

Lincoln – $3,033,179

MetLife – $0

Prudential – $242,461

Security Mutual – $5,743,771

Sun Life – $0

Union Central – $14,725,156

Docs. 324, 330. The Court adopted the Government's proposed actual loss amount of $38,153,631, thereby increasing Mr. Binday's sentence by 22 levels pursuant to the 2013 version of United States Sentencing Guidelines Section 2B1.1(b)(1). Doc. 349 at 37–38.

2.     Ineffective assistance of counsel

Sentencing is a critical stage at which Mr. Binday was entitled to the effective assistance of counsel. *Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Lopez v. Scully*, 58 F.3d 38, 41 (2d Cir. 1995). Mr. Frisch, however, was ineffective under the two-prong *Strickland* standard because he failed to properly challenge the Government's calculation of actual loss. Specifically, Mr. Frisch should have requested an evidentiary hearing regarding actual loss because the Government included loss from insurance companies for which there was no evidence at trial that Mr. Binday intended to deprive them of "potentially valuable economic information." Further, Mr. Frisch should have hired an actuary to determine a reasonable alternative calculation of the actual loss.

The mail and wire fraud statutes punish each "act in furtherance of the scheme or artifice to defraud" rather than the scheme to defraud as a whole. *United States v. DiPietro*, No. 2:92-CR-89 (JAC), 1993 WL 79499, at *2 (D. Conn. Jan. 13, 1993). Neither the Court nor the jury made any findings during or after the trial as to the scope of Mr. Binday's

scheme or for what act Mr. Binday was convicted. Nevertheless, the Government's actual loss calculation was not just for the four insurance companies named in the indictment (American General, Lincoln, Security Mutual, Union Central), the two insurance companies that had witnesses testify at trial (Lincoln and Prudential), or the five insurance companies that had anti-STOLI policies admitted at trial (Lincoln, American General, Hancock, Prudential, and Union Central). Instead, the Government included loss from nine insurance companies without any proof that the answers in the STOLI questionnaires or the insureds' financial information was potentially valuable economic information to each of them, except the testimony at trial from Lincoln and Prudential's witnesses about their own company's concerns. Assuming arguendo the evidence at trial was sufficient to prove Lincoln and Prudential suffered the actual losses alleged by the Government because Mr. Binday's representations were "potentially valuable economic information," the Government asserted those actual losses should be increased by more than an order of magnitude, from $3,275,640 to $38,153,631,[6] without any individual fact-finding as to why each insurance company refused to issue STOLI policies.

Mr. Binday does not dispute that it was proper for the Government to assert that the actual loss amount should include any relevant conduct that was part of the same "common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3 (2013). The proof was clear at trial, however, that even Avery and Burns disagreed as to the tangible economic harms

---

[6] The total actual loss is also erroneous because it relied on inaccurate assertions by the Government and the insurance companies regarding the premiums, commissions, and death benefits paid, including a $4 million death benefit paid by Lincoln for a life insurance policy that was not submitted by Mr. Binday or his co-defendants.

Lincoln and Prudential asserted may result from STOLI. While the Government admitted anti-STOLI policies from American General, Hancock, and Union Central as evidence at trial, the policies are without any explanation as to whether each insurance company would consider the information Mr. Binday deprived them of to be economically valuable, and, if so, why. GX 2904; GX 2915, GX 2951. The Second Circuit stated in Mr. Binday's direct appeal that the insurance companies' social concerns, such as those expressed in the aforementioned anti-STOLI policies, are non-economic reasons to avoid STOLI. *Binday*, 804 F.3d at 572 n. 14. If an insurance company did not believe the issuance of STOLI policies could result in tangible economic harm or if it did not otherwise use the financial information in pricing its policies, any loss incurred could not be part of the same scheme for which Mr. Binday was convicted and therefore was not relevant conduct at sentencing.

Whether the information was potentially valuable economic information for each insurance company other than Prudential or Lincoln should have been resolved at an evidentiary hearing at Mr. Frisch's request. Similarly, an evidentiary hearing would have allowed the Court to properly determine whether Mr. Binday's false statements were the "but for" cause of the actual losses incurred by each company. *See United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) ("[T]he government must show that the [victims] relied on [defendant's] fraudulent information to satisfy the 'but for' causation requirement under U.S.S.G. § 2B1.1."). Whether to waive an evidentiary hearing as to sentencing matters is a strategic decision, but such a decision must be reasonable. *Schwamborn v. United States*, 492 F. Supp. 2d 155, 163 (E.D.N.Y. 2007). Considering the intricate theory of fraud for which Mr. Binday was charged, the lack of evidence at trial regarding the

economic expectations of Hancock, American General, AXA, MetLife, Security Mutual, SunLife, and Union Central, and the Government's proposed 1,165% increase from the loss "proven" at trial by Lincoln and Prudential, such a waiver was unreasonable.

Further, Mr. Frisch should have retained an actuary to determine a reasonable alternative to the Government's actual loss calculation. The Second Circuit held the Government's "distorted" actual loss calculation was "unlikely to yield an accurate measure of the ultimate performance of the pool of policies." *Binday*, 804 F.3d at 597. It was unreasonable for Mr. Frisch to not use an expert to offer a reasonable estimate of how the pool of policies would have performed to recoup any financial loss to the insurance companies instead of attempting to reframe the same argument Mr. Abramowitz erroneously made at trial, that there was no economic loss. For example, a better and more reasonable estimate of loss would have been to compare the profitability of or loss from the policies at issue in this case with non-STOLI policies originated during the same time period. This amount can be calculated and is a better representation of the loss resulting from the scheme for which Mr. Binday was convicted. Sun Life, one of the carriers in the present case, admitted this was the proper way to calculate damages in civil STOLI litigation that it initiated. Ex. D at 7 ("Rather, Sun Life seeks to recover money damages because the lies of Imperial and its agents resulted in the procurement of an unprofitable portfolio. Sun Life's harm is not necessarily the future payment of a death benefit, but the past and current loss of expected revenue on the entire portfolio").

A successful challenge of the actual loss amount would have decreased Mr. Binday's sentence by at least four levels from Level 35 to Level 31. The recommended

guideline range at Level 31 for a Criminal History Category I is 108 to 135 months imprisonment, which is lower than the actual sentence imposed by the Court. Notwithstanding the Court's downward variance at sentencing, "the Guidelines are to be the sentencing court's starting point and initial benchmark." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016). Even when a court varies from the Guidelines, "the Guidelines are in a real sense the basis for the sentence." *Id.* at 1345. Mr. Binday was therefore prejudiced by Mr. Frisch's deficient representation because there is a reasonable likelihood his sentence would have been lower but for Mr. Frisch's error. *See Shu Feng Xia v. United States*, No. 14-CV-10029 RA, 2015 WL 4486233, at *6 (S.D.N.Y. July 20, 2015) ("In the sentencing context, [prejudice] can be established by a showing that the sentence would likely have been lower.").

  **B.** **Direct appeal of Ground Two:** Mr. Binday did not raise Ground Two in his direct appeal.

  **C.** **Post-conviction proceedings relating to Ground Two:** Mr. Binday has not raised Ground Two in any prior post-conviction motion.

**8.** **Motions, petitions, or appeals now pending:** Mr. Binday has one other motion pending. On October 6, 2016, Mr. Binday filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33 based on newly discovered evidence. Docs. 394, 395.

9.      **Representation by Attorneys:**

(1)     **Pre-Trial**

Richard Strassberg and Valerie Anne Haggans
Goodwin
(212) 459-7255
rstrassberg@goodwinlaw.com
vhaggans@goodwinlaw.com

Michael Miller
Steptoe
(212) 506-3955
mmiller@steptoe.com

Andrew M. Lankler
Baker Botts
(212) 408-2516
andrew.lankler@bakerbotts.com

(2)     **Trial**

Elkan Abramowitz & Benjamin Fischer
Morvillo Abramowitz Grand Iason & Anello PC
(212) 880-9500
eabramowitz@maglaw.com
bfischer@maglaw.com

(3)     **Sentencing**

Andrew Frisch
The Law Offices of Andrew J. Frisch
(212) 285-8000
info@andrewfrisch.com

(4)     **Direct Appeal**

Paul Shechtman
Bracewell
(212) 508-6107
paul.shechtman@bracewell.com

**(5)      Motion for Rehearing En Banc**

David W. Shapiro
Boersch Shapiro LLP
(415) 500-6644
dshapiro@boerschshapiro.com

**(6)      Petition for Writ of Certiorari**

David W. Shapiro
Boersch Shapiro LLP
(415) 500-6644
dshapiro@boerschshapiro.com

Ted Sampsell-Jones
Mitchell Hamline School of Law
(651) 290-6348
ted.sampselljones@mitchellhamline.edu

Paul D. Clement
Kirkland & Ellis LLP
(202) 879-5000
paul.clement@kirkland.com

10.    **Sentencing on more than one count or indictment:** Mr. Binday was not sentenced

on more than one indictment, but, as explained above, he was sentenced on each

count of conviction in his criminal case (Counts 1, 2, and 3).

11.    **No future sentence:** Mr. Binday does not have any future sentence to serve after he

completes the sentence in this case.

12.    **Timeliness of motion**: Mr. Binday's motion is timely. The Second Circuit Court of

Appeals affirmed his conviction on direct appeal on October 26, 2015. The Second

Circuit denied his petition for rehearing en banc on December 14, 2015. Mr. Binday

timely filed his petition for writ of certiorari in the United States Supreme Court on

March 10, 2016. The Supreme Court denied the petition for writ of certiorari on

June 20, 2016, rendering Mr. Binday's conviction "final" for the purpose of triggering Section 2255's one-year time limitation.

13.    **Request for Relief**

For these reasons, Petitioner Michael Binday respectfully requests the Court grant all relief to which he may be entitled in this proceeding, including, but not limited to:

1.    Vacation of Mr. Binday's judgment, conviction, and/or 12-year sentence;

2.    Granting of an evidentiary hearing where Mr. Binday may present further detailed evidence which would support his claims made in this motion; and

3.    Such other relief as the Court deems just and proper.

Respectfully submitted,

David W. Shapiro, NY Bar # 2054054
BOERSCH SHAPIRO LLP
1611 Telegraph Ave, Suite 806
Oakland, CA 94612
(415) 500-6644
dshapiro@boerschshapiro.com
DS-8121

/s/ *James Felman*
James E. Felman, FL Bar # 775568*
Brandon K. Breslow, FL Bar # 123755*
KYNES, MARKMAN & FELMAN, P.A.
P.O. Box 3396
Tampa, FL  33601-3396
Telephone: (813) 229-1118
Facsimile: (813) 221-6750
jfelman@kmf-law.com
bbreslow@kmf-law.com

*Pending Pro Hac Vice Admission*
*Attorneys for Petitioner Michel Binday*

I declare under penalty of perjury that the foregoing is true and correct. I understand that any false statement or answer to any questions in this application will subject me to the penalties of perjury (a fine of $10,000 or imprisonment for five (5) years, or both).

Executed on this 14th day of June, 2017.

_____
James E. Felman (FB# 775568)
Brandon K. Breslow (FB# 0123755)
KYNES, MARKMAN & FELMAN, P.A.
P.O. Box 3396
Tampa, FL 33601-3396
Telephone: (813) 229-1118
Facsimile: (813) 221-6750
Jfelman@kmf-law.com
bbreslow@kmf-law.com
*Attorneys for Petitioner Michael Binday*


*Pending Pro Hac Vice Admission*
*Attorneys for Petitioner Michel Binday*

_____
MICHAEL BINDAY
Petitioner