# The Evolution of Premium Financing and Life Insurance

*A Message from Steve Finch, President, John Hancock Life Insurance*



*Over the last few years the use of premium financing to fund life insurance has evolved quickly. A proliferation of financing programs and new financing concepts, with varying degrees of merit, are springing up continually. In this article, I will take a step back to give you my perspective on the impact of this proliferation of financing and what I see as the future direction of premium financing and life insurance.*

Q4, 2007

Traditional premium financing — where a loan arrangement is obtained to finance life insurance premiums with collateral consisting of assets, a personal guarantee and the policy cash value — is a viable planning tool in the right circumstances and has been around for years. However, roughly three to four years ago the premium financing market evolved to include transactions designed to facilitate the purchase of new life insurance policies by investors (Investor Owned Life Insurance or IOLI). In the early stages of IOLI, the most popular of these transactions were essentially pitched as two years of free insurance (often with a further upfront inducement) for the insured to "lend" his or her life to the transaction. The insured was further promised that all of the premium payments during the two years could be borrowed and that he or she could walk away after two years with no repayment of the loan and with no personal recourse (with the policy then sold into the secondary market).

These transactions suffer from a number of flaws; the most fundamental being that they lack an insurable interest. This obvious deficiency may have lead to the next phase in the evolution of the financing programs — the development of so-called "hybrid" financing arrangements. Instead of two years of free insurance with no recourse, the "hybrid" financing arrangements typically offered the insured five years of really cheap insurance with limited recourse (usually only around 20 to 25% of the financed premiums). While this refinement may have been an attempt to address insurable interest problems, in my view these changes are really form over substance. These "hybrid" arrangements are still designed solely to put returns from life insurance policies into investor hands. John Hancock has not approved these "hybrid" arrangements.

### Interesting Times

We are now several years past the start of the non-recourse premium financing arrangements, and I can see a number of trends emerging that are not unlike what happened in the sub-prime mortgage debacle, including: customers not fully understanding what they have gotten themselves into and investors not getting the returns they had anticipated. Some notable developments:

- Insurers challenging policies obtained by misrepresentation: Despite the openly stated opposition of a number of carriers to non-recourse premium financing arrangements, it is hard to believe that significant amounts of this business did not end up being sold. A number of insurance carriers are now pursuing legal action to cancel contracts that were obtained by misrepresentation on the application, and in which there was no valid insurable interest at the time of issue.

- Investors not earning the returns they anticipated: The Ritchie Capital and Lydia Capital lawsuits are two well-known recent cases of investors in life insurance policies not getting the value they anticipated from the policies they had purchased. I think it is likely that there will be many more such cases. I am aware of one lawsuit in which the family of an insured is seeking to force the investor to turn over to the insured's heirs the $10 million death benefit the investor had received from the insurer. It is also likely that investors' expectations of easy sales to the secondary market for a profit after two years will not pan out. Original life expectancy calculations are proving to be overly optimistic. It has gotten to the point where new programs are now being pitched as "IOLI Rescue" for transactions that have not worked out as originally anticipated.

contin

GOVERNMENT EXHIBIT 2911
12 Cr. 152 (CM) **(ID)**

HIGHLY CONFIDENTIAL    SUBJECT TO PROTECTIVE ORDER    JHUSA006313



### What's Next for Premium Financing?

I think we are just seeing the tip of the iceberg in terms of the outcome of all the non-recourse premium financing that has been written in the past several years if reports like those discussed in the recent Business Week article on Death Bonds are to be believed. I will hazard to give you my predictions for what we will see in the coming months and years as this evolution continues:

1. Further challenge of policies: We will continue to see insurance carriers challenge sales where fraud or misrepresentation occurred and where no insurable interest existed at the time of initial sale. In many states, including California, insurable interest challenges survive the contestable period and policies will be challenged past the two-year contestable point.

2. Lower returns for investors: I have thought for a long time that the dependence of investors on third-party life expectancy calculations for their pricing of these "assets" has been their blind spot. A $250 life expectancy calculation is, in my opinion, no match for underwriting shops like John Hancock's. In fact, life expectancy calculations from industry providers are now yielding longer expectations of life than they were a few years ago. I think we will see more investors realize a significantly lower return than they had anticipated and, as a consequence, expect more situations of investors becoming financially distressed.

3. Regulators' interest will ramp up: Regulators have shown increasing interest in IOLI transactions and are searching for ways to effectively regulate IOLI and the secondary market for life insurance. As situations emerge in which elderly constituents have been cheated or harmed, such as alleged by the Attorney General of the State of New York in his original complaint against Coventry, you will see regulators develop a greater sense of urgency in attending to this issue.

4. Investors' capital will start to flow elsewhere: Credit spreads in the capital markets (the yield for corporate bonds relative to US Treasuries) have begun to widen, making other investments relatively more attractive. This, combined with the legal challenges and lower returns previously discussed, will start to direct capital away from the acquisition of investor initiated life insurance policies.

5. Traditional premium financing will continue: Traditional premium financing will continue to be used as a viable planning tool and will be unaffected by all the turmoil in the markets.

John Hancock will continue to support a limited number of traditional premium financing programs that provide additional flexibility in wealth transfer planning, but which do not present any of the insurable interest issues of IOLI. We remain open to reviewing new financing arrangements, but will limit the number of approved lenders to a small handful. We have found that a strong relationship with the financing provider, built over time (like any other business relationship), ensures a high quality of business for John Hancock. We can be confident that the insureds in such business understand the arrangement they are entering into.

[2]

HIGHLY CONFIDENTIAL       SUBJECT TO PROTECTIVE ORDER       JHUSA006314