**EXHIBIT C**

1

BROMBERG AUDIO

TRANSCRIBED BY:    Denise Smith Byer, RPR, FPR
Notary Public, State of
Florida

Pages 1 - 25

P R O C E E D I N G S

1  

2       MS. BROMBERG:  Marty.

3       MR. BROMBERG:  Yes.

4       MS. BROMBERG:  Hi.  I have Marty Bromberg on

5  the phone.  Hi, Marty.

6       MR. BROMBERG:  Hi.  How are you?

7       MS. BROMBERG:  As you remember, this is Mike

8  Binday from --

9       MR. BINDAY:  Advocate.

10      MS. BROMBERG:  Advocate.  Thank you.

11      MR. BINDAY:  How's it going, Buddy?

12      MS. BROMBERG:  I know it's been a while since

13 we all spoke.

14      MR. BINDAY:  I'm good.  All right.

15      So in any case, I sent you an e-mail earlier.

16 I don't know if you saw that.  And I can answer any

17 question that Marty has.

18      MS. BROMBERG:  Okay.  Great.

19      So, Marty, why don't you start, and then I'm

20 going to --

21      MR. BROMBERG:  Well, my question is:  I have

22 that other policy with you.  And what happens if I

23 die before two years?

24      MR. BINDAY:  With the AXA policy?

25      MR. BROMBERG:  With both.

1        MR. BINDAY:  Well, the quick answer is, the

2    policy should pay.  I mean, there isn't any

3    underwriting I need to know.  And underwriting is

4    fine.

5        If you die in the first two years, the

6    insurance companies will -- as a matter of policy,

7    you know, probably contest the policy.  That means

8    that they would look into it and see if there is any

9    way they can get out of it before deciding whether

10    or not to pay a claim.  All right.

11        I don't know that there is any way to actually

12    get around it.  The only way that I've seen this

13    happen is if you misconstrue your medical

14    information.  So --

15        Hold on a second.  I just have to flip off the

16    cell phone.  Someone else is trying to call me.

17        All right.  Just so --

18        MR. BROMBERG:  My medical advice is 100

19    percent --

20        MS. BROMBERG:  Well, I think --

21        MR. BROMBERG:  Now, what is -- do I have any

22    lia -- you do this for a lot of people.

23        MR. BINDAY:  Uh-huh.

24        MR. BROMBERG:  Do I have any liability?

25        MR. BINDAY:  The answer, probably not.  The

1   worst case scenario is, typically if you die in the

2   first two years and the insurance company says

3   they're not going to go and pay a claim, they would

4   usually refund the premium.  And if they refund the

5   premium, everyone walks away.

6      There have been circumstances where insurance

7   companies said you did something that was completely

8   fraudulent and we're not going to go and refund the

9   premium, and then we --

10      MR. BROMBERG:  Well, who are they going to

11   refund the premium to?

12      MR. BINDAY:  Well, it would be refunded to the

13   trust.  And the trust -- you know, basically if the

14   premiums came from a lender or a funder, you know,

15   they would get their money back and, you know, walk

16   away from the deal.

17      MR. BROMBERG:  Now, who's the lender?  Is it

18   the -- the -- who do you send -- is it the hedge

19   fund?

20      MR. BINDAY:  Yes.  Well --

21      MR. BROMBERG:  What happens is if the hedge

22   fund goes bankrupt?

23      MR. BINDAY:  Well, it's just a matter of the

24   hedge fund.  That has no impact on you.

25      The -- the answer is that the AXA -- on the

1    AXA -- on the AIG policy, we've got that one

2    scheduled for an upfront deal, meaning -- what's it

3    called -- that someone is going to give you money

4    for it immediately.  Technically they give it to the

5    beneficiary, who's your wife -- but I think it's

6    your wife.  But they are going to give you money for

7    it immediately.

8        So -- probably -- hold on a second.  All right.

9        All right.  And -- and the other one we figured

10    was going to go through HM.  And that money went for

11    a two-year period.  So that -- that's for HM.

12        MR. BROMBERG:  Now, what's the difference

13    between the new one here -- the old one is the

14    two-year-period thing, you know.  What's the

15    difference on the new one, if I take some money

16    upfront or if I wait two years?

17        MR. BINDAY:  Obviously upfront money is

18    guaranteed, and two-year-period money is not

19    guaranteed, and you would always expect you would

20    get more money two years down the road.

21        I will tell you right now that we have an

22    industry that's in a little bit of a crisis because

23    there's been some changes in the past two days, and

24    we're struggling right now to get all the offers

25    honored.  So I'm trying to get everything I can

1    approved as fast as I can.

2        HM just called me on the phone call right

3    before yours, and I have someone on hold, which I'm

4    going to have to take in one second, because of the

5    crisis I'm going through right now.

6        HM told me that anything I get approved by the

7    end of next week, they're honoring.  And after that,

8    it has to be repriced based on their information

9    coming out from actuaries.  So --

10        MR. BROMBERG:  By the way, it's upfront, right?

11        MR. BINDAY:  If you get it upfront, it's

12    guaranteed, yes.  Two years is always a question

13    mark.

14        I've got to put you on hold for a minute to see

15    what's happening on the other line, because it's

16    somebody I do an awful lot with.

17        MR. BROMBERG:  Okay.  That's fine.

18        MR. BINDAY:  Hold on a minute, please.

19        MS. BROMBERG:  Oh, yeah.  Hi.  I'm sorry.  My

20    question to you is:  Who -- who -- if the insurance

21    companies don't pay the premiums, then they'll

22    refund the premiums because you took out more than

23    one policy.  I guess that's what they were saying.

24    They were saying fraud is because you take out more

25    than one policy?

1        MR. BINDAY:  Basically that's not why they

2    would claim fraud.  Typically, it would be more of

3    a -- you know, a medical or something like that, you

4    know, that you, you know --

5        MS. BROMBERG:  Oh.

6        MR. BINDAY:  -- had a heart attack.  I mean,

7    I've got to tell you, you know, theoretically, they

8    could connect fraud on any number of grounds.  But

9    they don't have the ability to find out a lot of

10   things.  In medical, you, on the application, sign

11   something giving them permission to go back and get

12   all your records for a couple of years.

13        MR. BROMBERG:  My life (inaudible).

14        MS. BROMBERG:  Well, when you -- if they don't

15   pay -- if they don't pay the premiums back, then

16   who's responsible for the premium?

17        MR. BINDAY:  It's an open question.  I mean,

18   could that come back to you?  It could.  I don't

19   have a good answer for that.

20        MS. BROMBERG:  Have they claimed -- have you

21   seen where they've claimed fraud in the case of

22   taking more than one policy out?

23        MR. BINDAY:  No.  I haven't seen that under

24   that circumstance.

25        MS. BROMBERG:  Okay.  So I guess what --

1    MR. BROMBERG:  (Inaudible) this is so it's

2    totally legal and legitimate?

3        MR. BINDAY:  Yes.

4        MR. BROMBERG:  Okay.

5        MR. BINDAY:  Yes.  I mean -- so that's what we

6    do is -- my concern right now is, is not with that.

7    My concern is getting the policies issued and then

8    are the offers going to hold up.  I mean, that's --

9    that's what -- that's what I'm more worried about --

10       MS. BROMBERG:  Right.

11       MR. BINDAY:  -- right now.

12       MS. BROMBERG:  So --

13       MR. BINDAY:  So, you know --

14       MS. BROMBERG:  Well, let's say --

15       MR. BINDAY:  I'm struggling over a little --

16   you know, literally in the past two days the

17   industry has gone crazy.

18       MS. BROMBERG:  Let me ask you a quick question.

19   Let's say Martin takes out another policy and does

20   it upfront.  And then the other -- the first policy,

21   he's already got a year on it, so in about a year,

22   if he decides to sell, he'll sell it.

23       MR. BINDAY:  Uh-huh.

24       MS. BROMBERG:  So then he'll make a couple --

25   he'll make a little bit of money.  But then let's

1   say, God forbid, he passes away after the first one

2   is sold but before the second one, he already took

3   that upfront money, the insurance company comes back

4   and says, we want a refund of all -- we want a

5   refund of the premiums and a refund of -- no, we

6   want a refund of the upfront money, basically,

7   because we're not going to payout the policy.

8        What happens -- like there's such an overlap in

9   time of -- between the first one and the second one,

10  that I'm concerned if something happens in between

11  that time, that he could be liable or stuck for the

12  money.

13       MR. BINDAY:  Well, first off --

14       MS. BROMBERG:  Do you understand what I'm

15  saying?

16       MR. BINDAY:  Unless someone -- unless you get

17  past two years, that -- that policy is valid, and no

18  one can do anything about it.  And if you sell it,

19  you sell it.  And that is that.  The big thing of

20  life insurance is two-year contestable.  Then at the

21  end of two years, you know, you're -- you know --

22       MS. BROMBERG:  Right.

23       MR. BINDAY:  -- it can't be contested.  All

24  right.

25       In terms of the one in that theoretical

1    scenario of, he dies, the first one, if he already
2    sold it, obviously, the money goes to the investors.
3         MS. BROMBERG:  Right.
4         MR. BINDAY:  And he already got paid out for a
5    settlement.
6         MS. BROMBERG:  Right.
7         MR. BINDAY:  And on the second one, it's still
8    with the investors, and he still got paid out on it,
9    and --
10        MS. BROMBERG:  But he may have to pay that
11   money back?
12        MR. BINDAY:  In theory, if the policy gets
13   contested, the funder could say, you know what, give
14   us back the money, yeah.  That's always in the realm
15   of possibility.
16        MS. BROMBERG:  Uh-huh.
17        MR. BINDAY:  It's -- most of the time they'll
18   walk away from it.  That's not what they're really
19   in the business of doing.
20        MS. BROMBERG:  Uh-huh.
21        MR. BINDAY:  But -- but could they?  You know,
22   it depends on the contract from the funder.  They
23   change the contracts on a regular basis.  There's
24   things in them that their lawyers put in that may
25   never actually be pursued.

1           I mean, if the insurance company says there was

2      fraud, contests the policy because he died in the

3      first two years, proves there was fraud, and then --

4      you know, and then the funder says, you know, hey,

5      we want the money back --

6           MS. BROMBERG:  Uh-huh.

7           MR. BINDAY:  -- you probably have to give the

8      money back.

9           MS. BROMBERG:  Right.  Right.  But could

10     Mr. Bromberg get put in jail or anything or --

11          MR. BINDAY:  Not if he's dead.

12          MS. BROMBERG:  Well --

13          MR. BINDAY:  No.

14          MS. BROMBERG:  Well, if they contest it -- if

15     they contest it while -- if they contest it while

16     he's still alive, and they want their prem -- their

17     money back, could he --

18          MR. BINDAY:  Well, nothing here is in the realm

19     of criminal fraud no matter what.  There's still --

20          MS. BROMBERG:  All right.  He just may have to

21     pay -- he just may have to pay the money back, and

22     we have to pay back the premium -- the commissions

23     and all that?

24          MR. BINDAY:  Uh-huh.  Correct.

25          MS. BROMBERG:  Okay.  And they -- well, will he

1     owe the funding company any money?

2         MR. BINDAY: In the case of a loan, no. In the

3     case of an upfront settlement --

4         MS. BROMBERG: Yeah.

5         MR. BINDAY: -- giving him money --

6         MS. BROMBERG: Right.

7         MR. BINDAY: -- and he could have to give that

8     back.

9         MS. BROMBERG: So would we have to pay interest

10     or anything?

11         MR. BINDAY: Allison, the answer is, generally

12     speaking, no. But, you know, each contract has

13     certain language in it.

14         MS. BROMBERG: Uh-huh.

15         MR. BINDAY: And have I ever seen one that put

16     language in asking for interest? Yes, I have seen

17     one funder that did put that type of language in.

18         MS. BROMBERG: Uh-huh.

19         MR. BINDAY: All right. Not somebody that we

20     usually deal with.

21         And are they actually going to enforce that?

22     Probably not.

23         Most of the stuff I deal with simply doesn't

24     have any language that deals with this in any way.

25         MS. BROMBERG: Uh-huh. Okay. So right now

1    we're waiting on two.  We have the AIG and the

2    Lincoln National.

3         MR. BINDAY:  Uh-huh.

4         MS. BROMBERG:  So it seems as though the AIG is

5    pretty much finished?  You are just waiting for me

6    to do my --

7         MR. BINDAY:  The AIG, it was approved, but

8    we're changing it to a New Jersey application.

9         MS. BROMBERG:  Right.  So I just have to

10   overnight -- I just have to sign the signature

11   pages?

12        MR. BINDAY:  Yeah.  And Janet was overnighting

13   those to Mr. Bromberg, I believe.  I don't know if

14   she's sending it to you or to Mr. Bromberg.  But

15   either case, she was sending that for the

16   signatures.  And once we get the signatures, we get

17   it to them, we get the policy approved.

18        MS. BROMBERG:  What does he need to sign for

19   the AIG, do you know?

20        MR. BINDAY:  The application.  Changing from

21   Florida to New Jersey is an entirely new

22   application.

23        MS. BROMBERG:  Oh, he's got to fill out a whole

24   new application?

25        MR. BINDAY:  Yes.  Yeah.  You don't have to

1    fill out the whole thing.  She copied all the
2    pages --
3         MS. BROMBERG:  Oh.
4         MR. BINDAY:  -- other than the signatures.
5         MS. BROMBERG:  Okay.
6         MR. BINDAY:  So all that we need is signatures
7    again.
8         MS. BROMBERG:  Oh, okay.
9         MR. BINDAY:  Whereas it's a New Jersey -- it's
10   a different application because it's a different
11   state.
12        MS. BROMBERG:  Okay.  And she marked -- in the
13   meantime, I just wanted to speak to you about the
14   Bromberg -- the Bromberg.  Is it a good market with
15   that?  I mean, do you still think we should go ahead
16   with that?
17        MR. BINDAY:  Well, I think you should go ahead
18   with it, absolutely.  You know what, I'm
19   guaranteeing he's not going to lose any money on it.
20   And I wouldn't be putting my money into it if I
21   didn't think I could.
22        So I mean, not that I'm putting a huge amount
23   of my money in, but I'm putting probably -- probably
24   my -- my loss on anything we've added to the
25   policies, if I can't sell it, is 5 percent of what

1     goes in.

2         MS. BROMBERG: Right. Oh, okay.

3         MR. BINDAY: I'm -- I'm -- I'm basically

4     putting my money in saying, you know, this is worth

5     it.

6         MS. BROMBERG: Right.

7         MR. BINDAY: And I'm doing that because I'm

8     counting on making a bigger commission --

9         MS. BROMBERG: Right.

10        MR. BINDAY: -- not using the 5 percent.

11        MS. BROMBERG: Right. So the market is okay --

12     I mean, you see, even though -- you know, the Madoff

13     thing and what's going on, you still see people

14     coming, stepping up to the plate?

15        MR. BINDAY: Well, we've got a bunch of things

16     that we're supposed to be moving forward on this

17     week on an upfront. We've got one European fund

18     that's been buying some stuff.

19        MS. BROMBERG: Okay.

20        MR. BINDAY: And we're -- we have other people

21     that are going to be buying in January. All right.

22     I mean, obviously the end of this year is very low

23     happening. It's basically over this year.

24        Of January, there are people that have

25     announced that they're coming back in and buying

1    stuff.  So you know, do I have --

2         MS. BROMBERG:  Right.

3         MR. BINDAY:  -- orders offered on him?  No.  Do

4    I expect to get it?  Absolutely.

5         MS. BROMBERG:  Right.  Right.  Okay.  Okay.

6    But it's worth a shot?

7         MR. BINDAY:  Exactly.  It's worth a shot.

8         MS. BROMBERG:  Right.

9         MR. BINDAY:  And you know what, I'll keep it

10   going for up to a full year, if necessary, just to

11   see what happens.

12        MS. BROMBERG:  Right.  Okay.

13        MR. BINDAY:  And if I can't buy into it until

14   the end of the year, we'll let the darn thing lapse.

15        MS. BROMBERG:  All right.  And they are okay

16   with that?  I mean, I guess it's a wash, you know.

17        MR. BINDAY:  Is who okay with it?  I didn't

18   understand.

19        MS. BROMBERG:  I mean, it's a wash, because we

20   pay them and they pay us -- I mean, you pay the

21   premiums, and then they pay the commission, so

22   they -- they're not losing anything?

23        MR. BINDAY:  Who?  Bridgewell?

24        MS. BROMBERG:  The insurance company.

25        MR. BINDAY:  The insurance company.  No.  The

1    insurance company is fine with it.  The insurance

2    company is getting paid, and that's all they care

3    about.  And if it lapses, it lapses, you know,

4    that's --

5          MS. BROMBERG:  Right.

6          MR. BROMBERG:  You know, obviously they don't

7    want it to lapse, at least in the beginning.

8          MS. BROMBERG:  Right.

9          MR. BINDAY:  But the insurance company's ideal

10   situation is that the policy will go into effect for

11   five or ten years and then lapses.  But they're not

12   counting on that.  They ruled it -- they got out of

13   lapse pricing years ago.

14         MS. BROMBERG:  Oh, okay.

15         MR. BINDAY:  But, you know, ideally, yeah, they

16   would love to collect really big premiums and then

17   the policy lapse without ever having to pay a death

18   claim.  That's --

19         MS. BROMBERG:  Right.  Of course.  Of course.

20         MR. BINDAY:  Yeah.  But -- so what --

21         MR. BROMBERG:  No.  No.  I kept about 75

22   percent of my equities in either Israel bonds, which

23   paid 6 percent.  And nowadays I don't know what

24   they're paying.  They're kind of -- you know, when I

25   called up the office, they said, well, we don't

1  know, you know.  But I'm going to buy them anyways.

2  They are automatically redeemable.  You know, they

3  keep -- they don't even send you the bonds anymore.

4  They just automatically send you the proceeds.

5       MR. BINDAY:  Which is nice.

6       MR. BROMBERG:  And I have a money market, and

7  the houses that sold are put into different

8  financial institutions.  Well, I'm pretty well --

9  you know, I'm in relatively good shape.

10      MR. BINDAY:  We're --

11      MR. BROMBERG:  The only problem that I have is

12  that I got this fuckin' letter that I find a full

13  recourse loan and I'm going to owe these guys like

14  $500,000.

15      MR. BINDAY:  Yeah.  Let me just explain.

16  They're doing -- they are sending stuff that they

17  legally have to send, but that's not the way that

18  their deal works.

19      And there's two options that are very simple.

20  One is, we sell the policy, which everyone is

21  happy.  And the second one is, you return the policy

22  to them, exercise the put, and don't owe them

23  anything.

24      And realistically, they've already offered to

25  extend the deal by an extra few months, if

necessary, to sell the policy, you know, realizing
the markets might not be so great.  They don't
really want to take it back.  They'd rather extend.
Not only do them -- on the policies where they see
there is a value.  But they have offered that.
And --

MR. BROMBERG:  I have a question.  By extending
it, am I taking any additional risks?  Not only put
options has a time limit.  You know, when you sell
and put it on the stock exchange or you buy a put,
you sell it as of a certain date.  Does this
automatically extend that put options to date?

MR. BINDAY:  Before I make the recommendation
to you, I want to look at that paperwork and make
sure that they're extending the put as well as the
loan, because I don't have the answer to that.  I
would imagine that it extended the put, but I just
don't know.

MR. BROMBERG:  I just don't want it to be a,
you know, caveat and then all of a sudden I owe
them, you know, money for the -- for the account.

But, you know, rather than take that risk, if
you do not have 100 percent certainty, I would just
as soon wait till January 8th, or whenever the due
date is, January 7th, and then just give it back to

1  them the way the original policy read, so -- I can

2  live without -- without the 100,000 or whatever, you

3  know, I thought I was going to get.  That doesn't

4  bother me.  I have free insurance.  The only concern

5  I have is being liable --

6      MR. BINDAY:  Uh-huh.

7      MR. BROMBERG:  -- for paying them back, you

8  know, the policy plus the 12 percent.

9      MR. BINDAY:  Legal -- I have it being shopped

10  right now, and I will give you more feedback over

11  the next -- in a week or two.

12      MR. BROMBERG:  Okay.  So, you know, I leave it

13  up to you.  My main concern is not having to pay the

14  principal.  And when we -- there's new money coming

15  in in January.  We still got seven or eight days to

16  try to sell it, you know, so much --

17      My feeling is, if it doesn't sell within, you

18  know, 30 days, then it's probably not going to sell

19  within 60 or 90 days.  But that is my own personal

20  feeling.

21      MR. BINDAY:  You know, I would disagree with

22  that.  But I'm not going to think about it right

23  now.  I'd rather get some feedback first.

24      MR. BROMBERG:  Right.  Right.  You really have

25  to determine whether that extension includes --

1    you know, you need it in writing and certified, that

2    it includes, you know, paying that extra premium,

3    and it also includes the extension of the put

4    option.

5         MR. BINDAY:  Absolutely.

6         MR. BROMBERG:  If my put option expires, you

7    know, I'm up -- I'm up the tree.  I'm stuck with

8    having the houses to support me.

9         MR. BINDAY:  Mr. Haas (sic), I'm not going to

10   let that happen.  This is something we are on top of

11   and are monitoring.  And I mean, you -- it is right

12   now with perfect safety built in.  And we're just

13   going to confirm it stays that way.

14        MS. BROMBERG:  Mike, you told me that they

15   extended the put options for a few months.

16        MR. BINDAY:  I'll try to go through all that

17   legal, legal stuff.

18        MS. BROMBERG:  Right.  You may need it in

19   writing.  I mean, you may need it --

20        MR. BINDAY:  I want to see it in writing,

21   Allison.

22        MS. BROMBERG:  Yeah.

23        MR. BINDAY:  All right.  I don't take chances

24   on that.

25        MS. BROMBERG:  Right.

1    MR. BINDAY:  So I want to see their extension

2    in writing just to make sure.

3        MS. BROMBERG:  Yeah, definitely.

4        MR. BINDAY:  All right.

5        MR. BROMBERG:  I don't think I even signed a

6    promissory note.  That's why I walked on that.  I

7    didn't sign it because I have the original paperwork

8    here, and I still have the -- the arrows that say

9    sign here, sign there.  So I don't recall even

10   signing a promissory note.

11       MR. BINDAY:  You clearly did sign that, and

12   we'd have a copy somewhere.  They wouldn't have made

13   the loan without it.

14       MR. BROMBERG:  Oh, I see.

15       MR. BINDAY:  That would not have happened.  All

16   right.

17       MS. BROMBERG:  But just to alleviate your

18   concerns, you're not responsible -- all you have to

19   do is give back the policy, and then everything is

20   made whole.

21       MR. BINDAY:  Right.

22       MR. BROMBERG:  I don't mind the extension as

23   long as I'm covered, you know, as long as I feel

24   that I have all the -- all the parameters are within

25   the framework of the original agreement.  I would

1    think that to meet the policy, in case we are trying

2    to buy --

3         MS. BROMBERG:  Yeah.  And he may have to sign

4    something also, Mike, my father, to extend it --

5         MR. BINDAY:  I'm sure he would.

6         MS. BROMBERG:  -- on his end.

7         MR. BINDAY:  I'm sure.  I would expect that.

8         MS. BROMBERG:  And then they would have to take

9    responsibility for the agreement.

10        MR. BROMBERG:  Any -- any -- any problem at

11   all, just give it back to them before -- before the

12   30-day deadline.

13        MR. BINDAY:  All right.

14        MR. BROMBERG:  If there is anything ambiguous

15   or anything that is not 100 percent or on the 10

16   percent.

17        MS. BROMBERG:  Yeah.

18        MR. BROMBERG:  The same -- I can live without

19   the -- I wasn't planning on any money anyway, okay.

20   That wasn't part of my budget, because I --

21        MR. BINDAY:  I want to wrap this up because

22   we're kind of going down the same turf again and

23   again.  So I will get answers to you on that.  And I

24   will give you a little feedback.

25        MR. BROMBERG:  Yeah.  You can e-mail me stuff,

1    you know.

2         MS. BROMBERG:  All right.  You know, I'll be in

3    touch.  Okay.  All right, Mike.

4         MR. BINDAY:  All right.  Thank you.

5         MS. BROMBERG:  No problem.  Thank you.

6         MR. BINDAY:  All right.  Bye-bye.

7         MR. BROMBERG:  Bye.

8              (End of transcription.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              CERTIFICATE OF REPORTER

1

2

3    STATE OF FLORIDA)

4    COUNTY OF HILLSBOROUGH)

5

6        I, DENISE SMITH BYER, RPR, FPR, Notary Public, do

7    hereby certify that I was authorized to and did

8    transcribe from audio the foregoing proceedings, and

9    that the transcript is a true and complete record of

10   such transcription; that a review of the transcript was

11   not requested; and that the transcript is a true and

12   complete record of my stenographic notes.

13          I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties;

16   attorneys or counsel connected with the action, nor am I

17   financially interested in the action.

18          DATED June 12, 2017 at Tampa, Hillsborough

19   County, Florida.

20

21                         _____

22                         DENISE SMITH BYER, RPR, FPR

23                         Notary Public

24

25