UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

MICHAEL BINDAY,

    Petitioner,

-against-

UNITED STATES OF AMERICA,

    Respondent.

---------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/23/18

17 Civ. 4723 (CM)
12 Cr. 152 (CM)

## DECISION AND ORDER DENYING PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT HIS SENTENCE PURSUANT TO 28 U.S.C. § 2255

McMahon, C.J.:

On October 7, 2013, following a twelve-day jury trial before this Court, Binday and his

two co-defendants were found guilty of conspiracy to commit mail and wire fraud, in violation of

Title 18, United States Code, Section 1349; mail fraud, in violation of Title 18, United States

Code, Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343, in

connection with a scheme to defraud insurance companies which the defendants purported to

serve as agents.[1]

On July 30, 2014, the Court sentenced Binday to 144 months' imprisonment, to be

followed by three years' supervised release. The Court also ordered substantial forfeiture and

restitution.

On October 26, 2015, the Second Circuit affirmed the convictions and sentences of

Binday and his co-defendants, directing only a limited remand, at the Government's request, for

---

[1] Defendants Kergil and Resnick were also found guilty of conspiring to obstruct justice through destruction of records, in violation of Title 18, United States Code, Section 1512(k) Binday was not charged in that count.

1

entry of an amended restitution order in a reduced amount of $37,433,914.17. *See United States v. Binday*, 804 F.3d 558, 601 (2d Cir. 2015). On December 14, 2015, the Second Circuit denied Binday's motions for panel and *en banc* rehearing. On June 20, 2016, the Supreme Court denied Binday's petition for a writ of *certiorari*. On June 24, 2016, this Court entered the amended restitution order that the Second Circuit had directed be entered. Shortly thereafter, Binday began serving his sentence.

On October 2016, three years after the jury's verdict, Binday filed a motion for a new trial based on purported "newly discovered evidence" pursuant to Rule 33(b)(1). On August 29, 2017, the Court denied the motion.

On June 20, 2017, Binday filed the instant motion to vacate, set aside or correct pursuant to 28 U.S.C. § 2255, alleging that he was deprived of his federal constitutional right to the effective assistance of counsel. On August 17, 2017, the Court issued an Order requiring the execution of a waiver of the attorney-client privilege by Binday; for the Government to file its response to the motion within 60 days of defendant's executed waiver; and allowing prior counsel to consult with the Government to determine if testimony from prior counsel is necessary and appropriate. The waiver was executed, an affidavit from trial counsel was filed, the Government tendered its response opposing the motion, and defendant replied.

The motion is denied and the petition is dismissed—there is no need for a hearing.[2]

## Binday's Ineffective Assistance Claims

To establish an ineffective assistance of counsel claim, "a defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is

---

[2] The Court presumes the reader's familiarity with the trial evidence and facts of the case.

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States* v. *Brown*, 623 F.3d 104, 112 (2d Cir. 2010); *see Strickland* v. *Washington*, 466 U.S. 668, 688-89, 693-94 (1984).

With respect to the first element—the "performance" prong—to eliminate the "distorting effects of hindsight," *Strickland*, 466 U.S. at 689, a reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).

Regarding the second element—the "prejudice" prong—a defendant must meet the "heavy burden" of showing "actual prejudice"; in other words, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 692, 694. A defendant cannot establish prejudice by merely showing that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693.

To warrant a hearing on an ineffective assistance of counsel claim in a Section 2255 petition, a defendant must show that he has a "plausible" claim of ineffective assistance of counsel. *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000). "Bald allegations" unsupported by evidentiary facts do not warrant a hearing. *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (quoting *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977).

3

### Trial Counsel

Binday argues that his trial counsel's performance was constitutionally deficient because they fundamentally and "obviously" "misunderstood" the law governing mail and wire fraud. (Mot. at 17). Binday asserts that there were three "permissible defenses" to the fraud charges against him: "(1) the defendant's lack of intent to defraud; (2) that any misrepresentations were not material, and (3) that the misrepresentations could not result in tangible economic harm, or stated another way, the victim was not deprived of 'potentially valuable economic information.'" (Mot. at 10-17). Binday then complains that his trial counsel, instead of crafting a defense around questions of intent, materiality, and economic harm, erroneously argued only that there was no "actual economic loss," even though such a fact "was irrelevant to Mr. Binday's case." (Mot. at 11-17).

It is true that an absence of "actual economic loss" (Mot. at 11) to an Insurer's bottom line is not in fact a viable defense to mail or wire fraud, since the Government is not required to establish that the economic harm that the defendants' contemplated was in fact realized. *See Binday*, 804 F.3d at 569 ("It is not required that victims of the scheme in fact suffered harm, but 'the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims'" (quoting *United States* v. *Novak*, 443 F.3d 150, 156 (2d Cir. 2006)).

But the absence of "actual economic loss," by itself, was not the gravamen of Binday's defense at trial. Rather, as he himself described in his Rule 33 motion, "Binday's argument at trial" was "that Prudential and the other insurers had engaged in a wink and a nod practice of bashing STOLI publicly, while secretly letting such policies 'slip through the cracks' so that they could earn the hefty premiums that the policies generated." Binday Mem. in Support of Rule 33 Motion at 13 ("Rule 33 Mem.") (Dkt. No. 395). Binday's defense focused on the

4

following interrelated propositions: that the defendants' "conduct was not fraudulent because the insurers happily issued STOLI policies while paying lip service to weeding out STOLI policies for public relations reasons" (i.e., an argument as to materiality and lack of a cognizable scheme to defraud); and that the defendants "did not intend to inflict, and the insurers had not in fact suffered, any harm" (i.e., that there was no intent to defraud) because "their deceit had caused no discrepancy between the benefits reasonably anticipated by the insurers and what they actually received," given that there is "no meaningful economic difference between STOLI and non- STOLI policies" (i.e., that the misrepresentations were not material and that there was no cognizable economic harm). *United States* v. *Binday*, 804 F.3d at 568.

Each reference Binday makes to support his characterization that his defense focused on a purported lack of "actual economic loss" distorts what the defense in fact argued to the jury: that, in light of the Insurers' willingness to accept STOLI policies from the defendants, (1) there was no cognizable or tangible economic harm, (2) the defendants could not have intended any such harm, and (3) any misrepresentations made by the defendants were immaterial to the bargain at hand. These were the legally viable theories of the defense case, which the defense argued from pre-trial motions to summation. (*See, e.g.*, Binday's Opposition to Government's Motions in Limine and Federal Rule of Evidence 404(b) at 3 (Dkt. No. 233) (noting that the defendants "intend to present evidence concerning the Insurers' *institutional awareness and encouragement* of the Defendants' activities to demonstrated not only that the Insurers were not defrauded, but that there was no scheme to defraud anyone here"). Binday's attempts to establish his attorneys' deficient performance through misleadingly incomplete compilation of portions of the trial transcript are simply without merit. *See United States v. Binday*, 12 CR 152 (CM), ECF Document #440, Government Memorandum at 15-20.

In regard to the *Strickland*'s prejudice prong, Binday asserts that "[t]here is a substantial likelihood that the evidence that Mr. Abramowitz neglected to present and the examinations he failed to conduct would have altered the outcome other case." (Mot. at 18). Putting aside the fact that "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect,'" (*Harrington* v. *Richter*, 562 U.S. 86, 111-12 (2011) (quoting *Yarborough* v. *Gentry*, 540 U.S. 1, 8 (2003))—especially where the attorney involved is an esteemed criminal defense practitioner and a leader of that Bar—each example Binday provides to establish prejudice falls far short of the mark.

Binday attaches emails from January and February 2006, between himself and Lily Levith, Prudential's Regional Brokerage Director, and argues they should have been introduced by the defendant to demonstrate that "Binday had no intent to harm the insurance companies because together they achieved an arrangement that he would continue to produce the [STOLI] business they wanted privately but could not accept publicly due to purely social and non-economic concerns." (Mot. at 20 (citing Pet. Exh. A)).

These emails—sent near the very inception of Binday's business, when it was "still ramping up [its] production with Prudential (Pet. Exh. A at 2 (Binday Email dated Jan. 24, 2006))—make no mention whatsoever of STOLI, IOLI, or even premium financing therein. Although Prudential was aware of STOLI's existence at this time (*cf.* Tr. 499 (Avery testimony that he first became aware of STOLI in approximately 2004 or 2005)), its efforts to combat STOLI over time evolved, and in April 2007, Prudential started requiring proposed policyowners to execute a certified statement designed specifically to ensure that STOLI policies were not issued by the company. (GX 2943 at 6-7 (Policyowner Statement containing questions to identify STOLI policies); *see also id.* at 1 (noting that "[m]ore recently, there has

6

been a proliferation" of STOLI policies "in which the intent, from the outset, is to settle the life insurance policies"); *id.* at 4 (noting that Prudential "will not issue insurance if it is determined that the policy is likely being applied for" STOLI)).

After Prudential imposed the requirement of execution of the Policyowners Statement, Binday and his co-conspirators continued to execute and submit Prudential applications with false answers as to these STOLI-related questions, with an aim of collecting commissions on Binday's "large case" business by tricking the Insurers into issuing the policies. *(See, e.g.,* GX 112 (Adler Prudential Application, dated Aug. 30, 2017); GX 118, 132 (Prudential Policyowner Statement for Adler, with "no" answers, dated Jan. 2, 2008); GX 805, 806, 826 (Espinal Prudential Applications, dated May 29, Sept. 20 and Dec. 14, 2007); GX 825 at 13, 827 at 8 (Prudential Policyowner Statement for Espinal, with "no" answers, dated Sept. 20, 2007); GX 2350 at 25 (Robinson Prudential Application and Policyowner Statement, with "no" answers, dated Dec. 14 2017)). Against the extensive evidence at trial regarding Binday's business at Prudential (including Prudential's investigation of Binday) in 2007 and 2008, it is evident the jury would have readily rejected any arguments from Binday based on these early 2006 emails. Thus, Exhibit A to Binday's Motion cannot undermine confidence in the verdict against him so as to establish prejudice.

Binday next points to (speculative and hypothetical) evidence that could have been presented regarding "Binday's knowledge of economic similarities between STOLI policies and other acceptable forms of life insurance," such as those which use "hybrid premium financing" and "single premium immediate annuities." (Mot. at 20). Binday further asserts that "many carriers, including Lincoln, continued to generate the same business that non-recourse lending generated, STOLI, by fiction of "hybrid" loans." (Mot. at 21). Assuming *arguendo* that there

7

were evidence to support these assertions, it would have done nothing to tip the scales in Binday's favor at trial.

First, Binday and his co-defendants in essence made this same argument by highlighting the economic and behavioral similarities between STOLI policies on the one hand and policies sold in the secondary life settlements market to argue that the anti- STOLI policies of the Insurers were fiction. That argument was considered and rejected by the jury.

Second, the overwhelming evidence of the Insurers' desire not to issue STOLI policies in particular, so as to warrant the crafting of specific questions designed to weed out and detect STOLI, would defeat any analogy posited to other types of financing programs. (*Cf.* Pet. Ex. B at 1-2 ("John Hancock has not approved these 'hybrid' arrangements. . . . We will continue to see insurance carriers challenge sales where fraud or misrepresentation occurred" and "will continue to support a limited number of traditional premium financing programs . . . but which do not present any of the insurable interest issues of IOLI.")). Thus, these arguments about Insurers' acceptance of other forms of insurance do not undermine confidence in the conviction.

Binday next argues that the defense erred in not attacking "the reasonableness of the insurance companies' expectations that STOLI policies would potentially cause tangible economic harm" by failing to cross-examine the Insurance company witnesses "regarding the basis for their companies' concerns" or by "present[ing] other evidence that the insurance companies' decisions were not adequately informed." (Mot. at 23). To the extent Binday argues that counsels' cross examinations of Messrs. Avery and Burns did not constitute reasonable performance, he ignores the principle that "[d]ecisions whether to engage in cross-examination, and if so to what extent and to what manner, are . . . strategic in nature." *United States* v. *Eisen,* 974 F.2d 246, 265 (2d Cir. 1992) (quoting *United States* v. *Nersesian,* 824 F.2d 1292, 1321 (2d

8

Cir.), *cert. denied*, 484 U.S. 957 (1987)). Defense counsel can hardly be faulted for declining to attempt to establish that the views of the two insurance company witnesses—one with four decades and the other with a quarter century's worth of insurance and actuary experience (Tr. 493, 630-31)—regarding STOLI were "entirely unreasonable or idiosyncratic" (Mot. at 23).

What the defense did accomplish on cross-examination was attempt to undermine the insurance company witnesses' assumptions regarding the economic impacts of STOLI. For instance, Mr. Abramowitz elicited from Michael Burns that he believed the most significant IOLI risks were "social, legal, and tax-related," and not "economic," and that any such economic impact would be "difficult to estimate" and "minor" (Tr. 699-702). Mr. Abramowitz also introduced evidence through Burns that Lincoln was "exploring opportunities to leverage [its] mortality and risk management expertise into new, nontraditional businesses" such as life settlements to "provid[e] institutional investors with opportunity for attractive returns," (Tr. 722-23 (DX 13)) and that there would be little difference in the economic consequences to Lincoln of a STOLI policy versus a life settlement policy sold immediately upon issuance (Tr. 727-31). Further, Mr. Abramowitz elicited that, in October of 2008, Burns had concluded that "STOLI activity ha[d] not had an adverse impact on [Lincoln's] mortality experience" (Tr. 731-32 (GX 2972 at 3)).

In regard to James Avery, after the Government had established on direct examination that the pricing of insurance policies at Prudential was based on "historical experience of" the performance of "classic," non-STOLI policies (Tr. 505), Mr. Abramowitz elicited on cross-examination that, if STOLI policies had in fact been issued by Prudential, it would have resulted in changes to product pricing to reflect the performance of STOLI within the pool. (Tr. 544). Mr. Abramowitz further established through Mr. Avery that Prudential did not

9

vary the cost of its insurance depending upon the intent of the insured to sell, premium financing, the purpose behind the purchasing of the insurance, and whether other applications were pending—each indicia of STOLI policies. (Tr. 547).

All those points were artfully elicited by Mr. Abramowitz to illustrate the difficulty of establishing "tangible economic harm" resulting to the insurance companies from the defendant's scheme. Defendant certainly suffered no prejudice from Mr. Abramowitz's choice in strategy.

Finally, Binday faults his defense counsel for failing to call him as a witness at trial. Mr. Abramowitz says in his affidavit that he and others at his firm, "advised [Binday] of his right to testify on his own defense on numerous occasions," and spelled out the "the potential benefits of his testimony as well as the significant potential risks associated therewith," including warning him "that his testimony could significantly jeopardize his credibility with the jury." (Abramowitz Aff. ¶¶ 3-4 (Dkt. No. 439)). These risks included being "confronted with the numerous false statements set forth in the insurance applications," as well as "the statements he made under oath during his testimony before the New York State Insurance Department." (*Id.* ¶ 4 (citing Order (Aug. 29, 2017) (Dkt. No. 431) (noting that Mr. Binday "lied under oath when the state authorities got involved.").

To the extent that Binday believes these risks attendant to his decision to testify could have been mitigated by the introduction of a purported prior consistent statement that was recorded between Binday and the family member of an insured's family member regarding his beliefs on lapse rates and economic harm (Mot. at 22 (citing Pet. Ex. C at 17)), that argument too fails. The statement—assuming it would have been admitted—would more likely have been viewed by the jury as a self-serving falsehood pitched by Binday to a straw insured's family

10

member to convince them that the scheme was not in fact fraudulent.

This lack of prejudice is underscored by the fact that both of Binday's co-defendants relied for their defenses on similar self-serving lies to establish lack of intent. Both failed to impress the jury.

James Kergil relied on testimony from cooperating witness Paul Krupit, to the effect that Kergil told Krupit that the insurance companies had wanted to issue STOLI, and insurers' financial statements indicating that universal life sales increased dramatically during the period that STOLI was popular, in arguing that the proof as to intent was insufficient at trial. *See Binday*, 804 F.3d at 580. In rejecting this argument, the Second Circuit noted that "[d]espite Kergil's unsupported and self-serving statement to Krupit, the jury was certainly entitled to infer, based on [anti-STOLI] certifications and other facts of the case, that Kergil was aware that the insurers did not want to issue STOLI policies, and that he intended that the numerous misrepresentations in the applications would cause the insurers to do so against their wishes." *Id.*

Similarly, Kevin Resnick's counsel argued in summation that Resnick lacked requisite intent, as evidenced in part by Krupit's testimony that Resnick had told Krupit that "[t]he insurance companies wanted these policies and turned a blind eye to all the red flags popping up in the policies . . . because they knew the truth. They knew that it was STOLI." (Tr. 1491). The jury, in convicting Resnick on all counts, necessarily rejected this argument too.

Far from a strategic error, defense counsel's advice to Binday about the negative consequences of his taking the stand, and the risk that he would be confronted with his systemic and repeated pattern of lies (on applications, to Straw Insureds, and under oath to a regulatory body), was sound and reasonable. That Binday now regrets taking his lawyers' sound advice in

11

no way undermines the Court's confidence in the jury's verdict.

## Binday's Sentencing Counsel

Binday argues that Mr. Frisch was constitutionally ineffective by "fail[ing] to properly challenge the Government's calculation of actual loss" in two ways. (Mot. at 26). First, Binday faults Mr. Frisch for failing to pursue an evidentiary hearing so that he could challenge the Government's decision to include loss from "insurance companies for which there was no evidence at trial that Mr. Binday intended to deprive them of 'potentially valuable economic information.'" (Mot. at 29). Second, Binday asserts that it was unreasonable for Mr. Frisch not to have retained an actuary to determine a "reasonable alternative to the Government's actual loss calculation." (*Id.*).

It is well-established that a defendant's counsel may properly decide to forego a *Fatico* hearing as a reasonable, tactical "matter of strategy," *United States* v. *Lee*, 818 F.2d 1052, 1056 (2d Cir. 1987); *see also United States* v. *Costa*, 423 Fed.Appx. 5, 8-9 (2d Cir. 2011) (summary order) (decision not to request a *Fatico* hearing fell "within the range of reasonable professional assistance"); *United States* v. *Santiago*, 330 F. App'x 234, 238-39 (2d Cir. 2009); *Brito* v. *United States*, No. 13 Cr. 589 (PKC), 2017 WL 3142074, at *3 (S.D.N.Y. July 24, 2017) (collecting cases); *Papetti* v. *United States*, No. Civ. 09-3626 (DRH), 2010 WL 3516245, at *6 (E.D.N.Y. Aug. 31, 2010) ("[T]he decision to forego a *Fatico* hearing is a matter of strategy and [a court will] presume that such a strategy is sound absent a strong showing to the contrary.") (internal quotation marks and citations omitted).

In this case, Binday's sentencing counsel prepared a thorough and well-reasoned sentencing memorandum, vigorously arguing for a non- incarceratory or short period of imprisonment. (*See* Dkt. No. 327). In support, he argued that there was no causal link between

12

the "idiosyncratic fraud at issue" and the economic harm as reflected in the Government's loss calculations. (*See id.* at 2-25). And, with regard to the actual loss calculation, Mr. Frisch argued specifically that the Government, by "excluding policies still in force on which the owners are still paying premiums, and may continue to do so for years," arrived at an "artificially high" loss amount by "exclud[ing] the most profitable period of life insurance" during which an Insured "exceeds his or her life expectancy." (*Id.* at 13). Mr. Frisch also argued, among other things, that the Government erred in calculating loss on a policy-by- policy basis instead of looking at the pool as a whole (*id.* at 21-22), and argued that the Government's calculation of actual and intended loss did not adequately account for the investment returns from premiums paid (*id.* at 22-23). Binday cannot simply point to Mr. Frisch's failure to ask for an evidentiary hearing as evidence of his deficient performance, in light of the many ways in which Mr. Frisch argued against the Government's method in calculating loss by way of his papers, and at the sentencing itself.

But assuming *arguendo* that Mr. Frisch's failure to request a *Fatico* hearing could be construed as unreasonable, Binday cannot sustain his claim in light of the absolute absence of what evidence, if any, a *Fatico* hearing might have established, so as to constitute prejudice to him. *See United States* v. *Costa*, 423 F. App'x 5, 8-9 (2d Cir. 2011). The crux of Binday's argument appears to be that, had sentencing counsel requested a *Fatico* hearing, he might have been able to elicit evidence that seven insurance companies (other than Prudential and Lincoln) may have not have been deprived of economically valuable information or exposed to economic risk as a result of the defendants' scheme. Binday, however, does not suggest what a "reasonable" actual loss calculation would have been. *Cf. Binday*, 804 F.3d at 597 ("Notably, the defendants have not offered an alternative calculation for actual loss, nor is one

13

readily apparent."). Indeed, Binday's failure to establish prejudice beyond mere hypothesis is evidenced by the conditional way in which his argument is couched: "*If* an insurance company did not believe the issuance of STOLI policies could result in tangible economic harm or *if* it did not otherwise use the financial information in pricing its policies, any loss incurred could not be part of [Binday's] scheme." (Mot. at 28).

But the Government established at trial, through the testimony of Messrs. Avery and Burns and through documents, that the insurance industry as a whole did not want STOLI. (*See, e.g.*, Tr. 496-97 (Avery, noting from his capacity at Prudential as well as his role on the American Council of Life Insurance Committee, that "the industry, as they began to understand it, . . . never wanted to issue a STOLI policy"); Tr. 536 (Avery noting that National Council of Life Insurance Legislators and the National Association of Insurance Commissioners had passed model regulation to make STOLI illegal)). And although the Government did limit its testimony to two industry witnesses (Prudential and Lincoln) at trial, it introduced corporate policy statements, not only from those two companies (GX 2922, 2943), but also from AIG (GX 2904), Hancock (GX 2915), and Union Central (GX 2951). It also introduced the STOLI-targeted questions used by each of nine Insurers, to which the defendants supplied false answers. (*See, e.g.*, GX 413 at 13 (Security Mutual questions); GX 531 at 5-6, 12-13 (Sun Life questions); GX 541 at 13 (AIG questions); GX 605 at 1-2 (Lincoln questions); GX 650 at 13 (Union Central questions); GX 1324 at 2-4, GX 1325 at 6-7 (AXA questions); GX 2000 at 2, 9, 16 (Hancock questions); GX 2350 at 25 (Prudential questions)). This evidence was more than sufficient for the Government to meet its burden to prove that the scheme included all nine Insurers by a preponderance for purposes of sentencing. It also establishes that Binday's assertion of prejudice on this score is nothing

14

more than hypothetical speculation.

Indeed, it is equally plausible that, had sentencing counsel insisted on a *Fatico* hearing, testimony and further evidence from the seven other Insurance companies might have yielded evidence supporting an even greater loss amount. For instance, certain of the Insurers had taken the position prior to sentencing that they were entitled to estimated losses based on in-force policies (*see* Gov't Sentencing Submission at 58 n.28). The Government—"unaware of precedent for awarding projected losses in [such] circumstances"—did not pursue this measure of loss at sentencing. *Id.* Had counsel insisted on a *Fatico* hearing, these additional losses may very well have been back on the table, exposing defendant to even greater loss amounts. As such, defense counsel cannot be faulted for declining to rolling the dice in this regard, especially when, as the Second Circuit noted on appeal, there are no "readily apparent" alternative measures of actual loss. *See generally Greiner* v. *Wells,* 417 F.3d 305, 319 (2d Cir.2005) ("We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside." (internal quotation marks omitted)).

Similarly, Binday cannot find *Strickland* fault or prejudice in his sentencing counsel's failure to hire an actuary. He has simply failed to establish that such testimony would have resulted in a different actual loss calculation so as to have impacted his sentencing or undermine confidence in his sentence.

Finally, even if Binday could do more than speculate as to whether either a *Fatico* hearing or an actuary would have resulted in a different Sentencing Guidelines range, Binday cannot establish any prejudice with regard to his sentence, because the Court in this case sentenced the defendants "the old-fashioned way" without regard to the loss amounts calculated for the Guidelines. (Sentencing Tr. 41-42 (the Court noting "[f]orget about the amount of fraud

15

loss, whatever it was or will turn out to be; in the end, this was a scheme perpetrated over a span of years, brazen . . . and characterized by truly horrible behaviors on the defendants' part"); *see also id.* at 11 (noting that this case is "a perfect example of why [the Guidelines] should be abolished" in light of "[t]he amount of time, the amount of money, the amount of effort that has been expended arguing about the guidelines and how they should be calculated instead of arguing about Mr. Binday"); *id.* at 40 (describing case as, after "long time discussing the calculation," one that proves the "idiocy" of the Guidelines). As this Court made clear in fashioning Binday's sentence, "[t]he fact that the nominal victims here are major insurance companies does not and ought not lessen the disgust with which we view the defendants' behavior." (*Id.* at 43). Indeed, the Second Circuit, in reviewing defendant's sentence, took "comfort in the district court's emphatic statement that it would have imposed the same sentence regardless of the loss amount, which renders any error in the loss calculation harmless." 804 F.3d at 598.

The motion is denied and the petition is dismissed.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. Section 2253(c)(2); *see United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997). Further, the Court finds, pursuant to 28 U.S.C. Section 1915(a) (3) that any appeal from an order denying Binday's motion would not be taken in good faith. *See Feliz v. United States*, 2002 WL 1964347, at \*7 (S.D.N.Y. 2002).

This constitutes the decision and order of the court.

May 23, 2018

Chief District Court Judge

16